**Exhibit 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ELI LILLY AND COMPANY, ELI LILLY EXPORT S.A., AND ACRUX DDS PTY LTD., | Judge Sarah Evans Barker |
| Plaintiffs, | Magistrate Judge Denise K. LaRue |
| v. | Case No. 1:13-cv-0851 SEB-DKL |
| PERRIGO COMPANY, PERRIGO ISRAEL PHARMACEUTICALS LTD., ACTAVIS LABORATORIES UT, INC. (f/k/a WATSON LABORATORIES, INC.), AMNEAL PHARMACEUTICALS LLC, LUPIN PHARMACEUTICALS, INC., AND LUPIN LTD., | |
| Defendants. | |

**DECLARATION OF JONATHAN HADGRAFT
IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
PERRIGO'S MOTION FOR SUMMARY JUDGMENT THAT THE
<u>ASSERTED CLAIMS OF THE '944 AND '520 PATENTS ARE ANTICIPATED</u>**

# **INDEX OF EXHIBITS**

| Exhibit | Description |
| --- | --- |
| A | February 19, 2016, Rebuttal Expert Report of Jonathan Hadgraft, D.Sc. in Response to Expert Report of Walter G. Chambliss |
| B | February 19, 2016, Rebuttal Expert Report of Jonathan Hadgraft, D.Sc. in Response to Expert Report of Russell Owen Potts, Ph.D. With Errata |
| C | February 19, 2016, Expert Report of Dr. Irwin Goldstein |
| D | Excerpts of Deposition Transcript of Nina Webster including Exhibit Numbers 13, 20, 43 |
| E | Excerpts of Deposition Transcript of Tim Morgan |
| F | Excerpts of Deposition Transcript of Adam Watkinson including Exhibit Numbers 4, 12, 14, 15, 17, 19 |
| G | Excerpts of Deposition Transcript of Jonathan Hadgraft |
| H | Excerpts of Deposition Transcript of Walter G. Chambliss (filed under seal) |
| I | Excerpts of Deposition Transcript of Russell O. Potts (filed under seal) |
| J | Literature describing application sites for transdermal products:<br>• Testoderm®<br>• Androderm®<br>• Androgel®<br>• Testim®<br>• Soufir et al., Reversible inhibition of sperm production and gonadotrophin secretion in men following combined oral medroxyprogesterone acetate and percutaneous testosterone treatment, Acta Endocrinologica 102: 625 (1983) (Percutacrine Androgenique Forte)<br>• Evamist® |
| K | Prausnitz and Langer, *Transdermal Drug Delivery*, Nat. Biotechnol. 26(11):1261 (2008) |
| L | Production documents LILLYAX-00014109-4110; LILLYAX-00156109-12 |

I Jonathan Hadgraft, D.Sc., declare as follows:

1. I have been retained in this case on behalf of Plaintiffs, Acrux DDS Pty Ltd., Eli Lilly Export S.A., and Eli Lilly and Company, on the subject of infringement and validity of the patents-in-suit. I expect to provide opinions on these subjects at trial, including that U.S. Patent Nos. 8,435,944 ("the '944 patent") and 8,993,520 ("the '520 patent") are not anticipated, that they are not obvious, and that objective indicia support non-obviousness.

2. Attached at Exhibit A is a true and correct copy of my February 19, 2016, rebuttal report in response to the expert report of Walter Chambliss. Attached at Exhibit B is a true and correct copy of my February 19, 2016, rebuttal report with errata in response to the expert report of Russell Potts. I adopt these opinions and incorporate them herein.

3. Attached at Exhibit C is a true and correct copy of Dr. Goldstein's rebuttal report, which I considered. I also considered the depositions of inventors Nina Webster, Tim Morgan, and Adam Watkinson. Excerpts from their transcripts are attached at Exhibits D, E, and F. Excerpts from my deposition and from Dr. Chambliss' and Dr. Potts' depositions are attached at Exhibits G, H, and I. Attached at Exhibits J, K, and L are descriptions of the application sites for transdermal testosterone products other than Axiron®, and for Evamist®, a transdermal estrogen product, and publications and documents I reviewed in this case that are responsive to Dr. Chambliss' declaration and opinions.

4. I have been working in the field of biophysical chemistry, with a specific focus on the application of physical chemistry to drug delivery via the skin, for more than thirty-five years. I am currently an Emeritus Professor of Biophysical Chemistry at the School of Pharmacy

1

with the University of London, where I participate in teaching and research.  Prior to assuming Emeritus status, I was a full-time Professor of Biophysical Chemistry.

5.  Prior to my positions with the University of London, I was a Research Professor of Pharmaceutical Chemistry at University of Greenwich (United Kingdom), where I taught and conducted research.  I also served as the Director of the Skin and Membrane Transfer Group.

6.  Before joining the faculty of University of Greenwich, I was a Professor of Pharmaceutical Chemistry at the University of Cardiff (United Kingdom).  I also served as Head of the Pharmaceutical Chemistry Department.  Prior to that position, I served as a Lecturer in Pharmaceutical Chemistry at University of Nottingham (United Kingdom) from 1979-1985, and at University of Strathclyde (United Kingdom) from 1977-1979.  After completing my doctorate studies but before serving as a Lecturer, I was a Teaching Fellow with the School of Pharmacy, University of London (United Kingdom).

7.  I received a B.A. and M.A. in Chemistry, with an emphasis on Chemical Pharmacology, from the University of Oxford in 1973.  I received my doctorate in Physical Chemistry from the University of Oxford in 1975.  I received a D.Sc. from the Faculty of Medicine (University of Oxford) in 1992, in recognition of my research in drug delivery.

8.  My research primarily investigates dermal and transdermal drug delivery.  I also have significant industry experience.  I have acted as a consultant for a number of pharmaceutical companies, including Acrux DDS Pty Ltd., GlaxoSmithKline, Wyeth, and Mylan.  I also served on the scientific advisory board for Nemaura Pharma, a specialty pharmaceutical company focusing on enhanced transdermal delivery of drugs.

9. I am an author of over 500 peer-reviewed scientific articles in the fields of dermal and transdermal drug delivery. I have been a peer reviewer, and on the editorial boards, for a number of scientific journals, including the International Journal of Pharmaceutics, Pharmaceutical Research, Journal of Pharmaceutical Sciences, European Journal of Pharmaceutical Sciences, Journal of Skin Pharmacology, European Journal of Pharmaceutics and BioPharmaceutics, and FABAD Journal of Pharmaceutical Sciences. I am co-editor of several books, including *Transdermal Delivery* (1st and 2nd editions), *Skin Penetration Enhancement*, and *Modified-Release Drug Delivery Technology* (1st and 2nd editions).

10. I am the founder of the Prediction of Percutaneous Penetration Conference and have been on the Organizing Committee on Barrier Function of Mammalian Skin (Gordon Research Conferences). I also founded Skin Forum, which includes multiple academic and industrial research groups in the UK and EU who are interested in mechanisms of dermal penetration. Skin Forum is now an established focus group of The Academy of Pharmaceutical Sciences. In recognition of my contributions, I was named a Fellow of the American Association of Pharmaceutical Scientists, Academy of Pharmaceutical Sciences, and the Controlled Release Society.

11. In my opinion, U.S. Patent Application Publication No. 2004/0028725 ("the '725 Publication") does not anticipate the Axilla Patents. It does not disclose application of a transdermal formulation to the axilla. The '725 Publication is directed to use of a sunscreen agent as the penetration enhancer and delivery of a formulation by means of a shroud spray device. (Ex. A at ¶ 58.) It describes *how much surface area to cover* to deliver a therapeutic dose, but *not where to apply* the formulation. (Ex. A at ¶¶ 59-60; Ex. B at ¶ 201.)

12. A person of ordinary skill in the art would *not* envisage application to the axilla from the disclosure of the '725 Publication. (Ex. G at 223:15-224:3.) The '725 Publication discloses that a formulation with the claimed novel penetration enhancer can deliver a therapeutic dose of an active ingredient by covering varying amounts of surface areas. A person of ordinary skill in the art would not have understood the disclosure of the 725 Publication to refer to a particular application site, and in any event, would not have considered the axilla suitable for transdermal testosterone delivery. The axilla is a region located under the shoulder joint and forms a depressed or hollow region, i.e., a bowl, that has arteries, apocrine and eccrine glands, nerves, lymph nodes, fat, loose connective tissue, folds, and the brachial plexus. The axilla is predominantly hairy and sweaty, and it contains enzymes that can metabolize testosterone, and may contain residue from antiperspirant or deodorant products, any or all of which could impede or obstruct safe and effective transdermal drug delivery. (Ex. A at ¶¶ 47-50; Ex. B at ¶¶ 48-51; Ex. G at 197:5-12, 204:21-24, 210:10-21, 248:17-249:19.) The axilla was not considered a suitable site for transdermal drug delivery, at least because the presence of hair, sweat, and enzymes that could impede or obstruct transport of the active ingredient into systemic circulation. (Ex. A at ¶¶ 47-50; Ex. B at ¶¶ 48-51; Ex. G at 233:3-16, 239:11-242:20, 260:14-263:10.)

13. The axilla has vastly different characteristics from other regions traditionally used for transdermal drug delivery; it is hairy and contains eccrine and apocrine glands, and contains enzymes capable of metabolizing an active ingredient such as testosterone. (Ex. A at ¶¶ 47-50; Ex. B at ¶¶ 48-51.) By 2005, it was known that transdermal testosterone applied to the scrotum resulted in abnormal levels of circulating DHT (a metabolite of testosterone) believed to be because of the density in the scrotum of an enzyme that converts testosterone to DHT, and it was

4

reported that this enzyme was present in the axilla in higher densities than in other areas. (Ex. A at ¶ 51; Ex. B at ¶ 52; Ex. G at 230:9-232:13, 288:15-289:5.) I understand that abnormally high DHT levels can cause baldness, acne, enlarged prostate, and potentially prostate cancer. (Ex. C at ¶ 20.)

14. Testosterone is very water insoluble, which makes transdermal delivery of testosterone particularly challenging. (Ex. A at ¶ 49; Ex. B at ¶ 50.) The art and all approved transdermal testosterone products taught administration of transdermal testosterone to non-hairy, non-sweaty areas, and not to the axilla. (Ex. A at ¶¶ 28-31; Ex. B at ¶¶ 29-32.) In 2000, the FDA approved the first non-occlusive transdermal therapy, Androgel®, a gel that is applied to the shoulders and upper arms and/or abdomen, (Ex. A at ¶ 29; Ex. B at ¶ 30) as shown below:



5

In 2002, the FDA approved Testim®, a testosterone gel applied to the shoulders or upper arms:



In summary, testosterone transdermal treatments as of 2005 were applied as follows, as documented in the material at Ex. J:

- abdomen, shoulders, upper arms - Testoderm
- abdomen, upper arms, back, thighs - Androderm
- abdomen, shoulders, upper arms - Androgel
- shoulders, upper arms, upper torso - Testim
- abdomen, trunk - Percutacrine Androgenique Forte (PAF).

15. Until the approval of Axiron®, not a single transdermal drug for systemic delivery was approved for administration to the axilla, despite a steady increase in the number of transdermal drug approvals. (Ex. K, Prausnitz and Langer, *Transdermal Drug Delivery*, Nat. Biotechnol. 26(11):1261 (2008).) In 2005, the state of the art, as described by one author was that "we know virtually nothing about axillary skin." (D.I. 269-21, Watkinson et al., *Reduced Barrier Efficiency in the Axillary Stratum Corneum*, Int'l J. Cosm. Sci. 24:151, 151 (2002).)

6

16. As another example, a non-occlusive transdermal treatment, a commercial embodiment of the '725 Publication, is an estrogen spray applied to the forearm, not to the axilla. This product, sold today by Perrigo, is applied with the shroud device described in the '725 Publication. (Ex. J, Evamist Prescribing Information at 2.1 "Treatment of Moderate to Severe Vasomotor Symptoms due to Menopause.")

17. As shown below, the dimensions of 10 to 800 $cm^2$, 10 to 400 $cm^2$, and 10 to 200 $cm^2$, as described in the '725 Publication, do not identify a site of application but rather how much of a formulation to apply to achieve a safe and effective transdermal dose:

10 cm$^2$

200 cm$^2$

8



18. The human skin surface area is about 1.9 m$^2$. (D.I. 269-17 at 144 (Wester 1989).) On each side of the human body, there are thousands of areas that comprise 200 cm$^2$ and many more that comprise a surface area of 10 cm$^2$.

19. In view of the state of the art in 2005, and the teachings of the references themselves, a person of ordinary skill in the art would have understood Cutter (2000), Cutter (2001), Chein, Kryger, and other references to teach application to areas distinct from the axilla, and not to the axilla itself. (Ex. G at 260:14-261:24, 281:5-285:24.) A person would not have envisaged the axilla as a site to apply transdermal testosterone—regardless of the size of the surface area because non-hairy regions that did not have the sweat or enzyme activity, or presence of deodorants or antiperspirants, were preferred for the reasons explained above.

20. Regardless of controversies in the field concerning the role of hair follicles or whether the axilla was more permeable than other areas, the axilla was *not* considered a suitable site for transdermal testosterone delivery. Wester (1989) and similar references, e.g., Pfister (1997), Lee (1998), and Watkinson (2002), which are either derivative of Feldmann (1967) and Maibach (1971), or discuss permeability of the axilla in general, did not teach and would not have suggested to a person of ordinary skill in the art that it would be safe and effective to apply transdermal testosterone to the axilla.

21. For example, U.S. Patent Application Publication No. 2005/0042268 ("the '268 Publication" or "Aschkenasy"), directed to a formulation with urea, does not teach or disclose that transdermal testosterone is suitable for application to the axilla. (D.I. 269-12; Ex. A at ¶¶ 130-134; Ex. B at ¶¶ 194-199; Ex. G at 215:19-220:6.) U.S. Patent No. 6,562,790 ("the '790 patent" or "Chein") does not teach or disclose topical administration to the axilla but instead discloses topical administration to "under arm pits," a region distinct from the axilla (under the

arm pits). (D.I. 269-13; Ex. A at ¶¶ 113-116; Ex. B at ¶¶ 184-186; Ex. G at 211:5-212:25.) Publications Cutter (2001) and Cutter (2000) do not teach or disclose transdermal administration to the axilla but instead disclose an application to the chest near the axilla and the non-hairy area of the axilla. (D.I. 269-14 at 24, 30; Ex. A at ¶¶ 109-112; Ex. H at 241:18-242:5; Ex. B at ¶¶ 180-183.) U.S. Patent No. 6,743,448 ("the '448 patent" or "Kryger") does not teach or disclose topical administration to the axilla but instead discloses topical administration to hairless skin along the rib area below the armpit and the underarm. (D.I. 269-16 at 4:48-49; Ex. A at ¶¶ 126-129; Ex. G at 259:3-260:6.)

22. In late 2004, Acrux discussed application of transdermal testosterone to the axilla. The idea was met with skepticism. (Ex. D at 305:10-14; Tab L at LILLYAX-00014109-10; Ex. F at 29:15-30:22; Ex. D at Dep. Ex. 43, LILLYAX-00400456 and 233:4-234:10, 236:18-237:10) (the MHRA inquired whether Acrux assessed patients with hairy armpits because they were concerned that more hair may prevent absorption).)

23. Approved products for transdermal testosterone consistently have been administered to regions distinct from the axilla. (Ex. J, description of the application sites for PAF, Androgel® (2000), Testim® (2002), Testogel® (2004), Fortesta® (2010), and Vogelxo® (2014))

24. In conclusion, the '725 Publication does not expressly or impliedly disclose transdermal testosterone administration to the axilla. None of the scientific literature prior to the invention of the Axilla Patents supports Perrigo's argument that the prior art taught, suggested, or motivated a person of ordinary skill in the art to apply testosterone to the axilla of an adult male for transdermal drug delivery. To the contrary, the scientific literature correctly perceived a broad variety of non-hairy, potential application sites, and that a safe and effective transdermal

11

drug delivery site depended on the (i) active ingredient, (ii) inactive ingredients, and (iii) characteristics of the application region, including amount of hair, sweat, enzyme activity, surface area, permeability, and other considerations. (Ex. A at ¶ 164; Ex. B at ¶ 227.) In 2005, a person of ordinary skill in the art would not have considered the axilla a safe and effective application site. Until the approval of Axiron®, all commercial transdermal testosterone products were applied to regions distinct from the axilla. (Ex. A at ¶¶ 46; Ex. B at ¶ 47.)

I hereby declare pursuant to 28 U.S.C. § 1746, under the penalty of perjury of the laws of the United States, that the foregoing is true and correct.

Dated: May 16, 2016

_____
Jonathan Hadgraft, D.Sc.